IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JOHN W. OLLER, JR.     CIVIL ACTION NO. 611-CV-02207

VERSUS         JUDGE RICHARD T. HAIK, SR.

NANCYE C. ROUSSEL, individually and in  MAGISTRATE C. MICHAEL HILL
her official capacity as Head of the Department
of Communicative Disorders at the University
of Louisiana at Lafayette; A. DAVID BARRY,
individually and in his official capacity as Dean
of College of Liberal Arts at the University of
Louisiana at Lafayette, MARTIN J. BALL,
Individually, Professor of Communicative  JURY TRIAL DEMANDED
Disorders at the University of Louisiana at Lafayette

## FIRST AMENDED COMPLAINT

  NOW COMES BEFORE this honorable Court, plaintiff John W. Oller, Jr., by and

through counsel, who pursuant to Fed. Rule of Civil Procedure 15, with consent of the

defendants, amends his original Complaint.

### INTRODUCTION

1.

  The cornerstone of public higher education is the freedom of professors to research,

study, and discuss competing theories and ideas inside and outside the classroom. This academic

freedom of speech guards the faculty of public colleges and universities so that they may

innovate and expose students and peers to new ideas and theories. This freedom thereby

maintains an academic environment facilitating advances in knowledge by denying legitimacy to

any requirement that scholarly conclusions conform to conventional premises, political or

financial pressure from vested interests, or professional consensus based on dated research.

1

2.

In service of such liberty of scholarship, the University of Louisiana at Lafayette (UL) by policy pledges to preserve faculty academic freedom, including the freedom to "study, discuss, investigate, teach, conduct research, and publish as appropriate to their respective roles and responsibilities." However, certain UL officials deny this freedom to one faculty member, Plaintiff Dr. John Oller.

3.

Dr. Oller is an internationally recognized expert in theoretical semiotics and associated research, and has applied his expertise to the study of language acquisition and development, communicative disorders, and autism causation and remediation.  Dr. Oller was invited to join the UL faculty for the purpose of creating and guiding to Louisiana Board of Regents approval the Communicative Disorders (CODI) Ph.D. program in Applied Language & Speech Sciences (ALSS), a task he efficiently accomplished.

4.

But in the years since, the environment in the CODI department has grown hostile to his views on matters of professional and public concern, and department members have engaged in concerted efforts to eliminate his contributions to CODI students at UL.  Defendants have systematically excluded Dr. Oller from teaching opportunities such that they have now denied him the opportunity to teach any CODI students, at any academic level – doctoral, masters, or undergraduate; and have forbidden him to use the textbooks he authored to teach his classes, even to non-CODI students.

2

5.

Dr. Oller brings this civil rights action under 42 U.S.C. § 1983 seeking relief against Defendants for violating his rights guaranteed by the First Amendment to the United States Constitution, and to enforce his rights under Louisiana state law.

**JURISDICTION AND VENUE**

6.

This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under the First and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to recover damages and secure equitable relief under an Act of Congress, specifically, 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; under 28 U.S.C. § 2201(a), to secure declaratory relief; and under 28 U.S.C. § 2202, to secure preliminary and permanent injunctive relief and damages. This Court has supplemental jurisdiction over the state law claims made herein pursuant to 28 U.S.C. § 1367.

7.

Venue is proper under 28 U.S.C. § 1391 in the United States District Court for the Western District of Louisiana because the events giving rise to the claim occurred within the District and because all parties are residents of the District.

**PLAINTIFF**

8.

Plaintiff John W. Oller, Jr., is a resident of Lafayette, Louisiana.  He was the Doris

B. Hawthorne/Board of Regents Support Fund Endowed Professor IV in the CODI department at

the University of Louisiana at Lafayette until stripped of his endowed professorship on July 19,

2013 in retaliation for his First Amendment beliefs and for filing this lawsuit.

**DEFENDANTS**

9.

Defendant Nancye C. Roussel is Associate Professor of Communicative Disorders

at the University of Louisiana at Lafayette. She has served as Head of the CODI department

since the Fall of 2008. Defendant Roussel violated Dr. Oller's First Amendment rights and

violated the Louisiana law of obligations by breaching promissory and contractual obligations to

him. She is sued in her official and individual capacities.

10.

Defendant A. David Barry is Dean of the College of Liberal Arts at the University

of Louisiana at Lafayette. Defendant Barry violated Dr. Oller's First Amendment rights and

violated the Louisiana law of obligations by breaching promissory and contractual obligations to

him. He is sued in his official and individual capacities.

11.

Defendant Martin J. Ball is Professor of Communicative Disorders at the

University of Louisiana at Lafayette. He served as Chair of the CODI Department from April

2004 through the spring semester of 2008. Defendant Ball violated Dr. Oller's rights under

4

Louisiana law of obligations by breaching promissory and contractual obligations to him. He is

sued in his individual capacity.

## FACTUAL BACKGROUND

### Dr. Oller's Qualifications and Career

12.

Dr. Oller is a model scholar. He has taught courses in linguistics, research design,

language and intelligence testing, literacy, language acquisition, measurement theory, and in

communication disorders at the university level for over 40 years. He has 17 peer-reviewed

published books to his credit, and 246 peer-reviewed articles in professional journals, books, and

encyclopedias.

13.

Dr. Oller represents the scholarly ideal through his critical and innovative

approaches to the subjects of his study. His work is distinguished by its currency, theoretical

sophistication, and empirical reliance, rather than subservience to comfortable and dated

assumptions.

14.

Dr. Oller lectures around the world and has been acknowledged with national and

international awards, multiple grants totaling more than a million dollars, and hundreds of

published accolades and citations of his scholarly work.

15.

An encyclopedia article titled "John Oller" by Dr. April Ginther of Purdue

University has been accepted for publication in *The Encyclopedia of Applied Linguistics* in 2012.

5

This article summarizes and praises Dr. Oller's lifetime of achievements in the fields of language testing and communication disorders.

16.

Dr. Oller began his teaching career at the University of California, Los Angeles (UCLA) in 1969. UCLA awarded him tenure after two years, making him the youngest tenured associate professor in the University of California system.

17.

In 1972, Dr. Oller joined the faculty of the University of New Mexico and successfully built the Department of Linguistics, including its undergraduate, masters, and Ph.D. programs.

18.

Dr. Oller was recruited to UL by Professor Jack Damico and others.  He was induced to change positions, in part, by the UL academic freedom policy and representations that he would enjoy the highest standards of academic freedom.  Upon arriving at the University of Louisiana at Lafayette, he led the design of its unique Ph.D. program and shepherded it to approval by the Board of Regents in 2001.

19.

As an instructor, Dr. Oller consistently receives highest marks from UL students in their course evaluations. These review scores exceed the averages both in the university at large and in the CODI department.

20.

Dr. Oller's enthusiasm for his work extends outside the classroom, demonstrated

6

by his active community and charitable service in areas of public concern related to his scholarly

expertise.

21.

Dr. Oller has published widely on semiotic theory and on the association of toxins

and disease agents with autism spectrum disorders. Over the years he has taught courses at UL

in which he elaborated these issues.  He has also since 1981 publicly lectured and published

works on creation and intelligent design, as against evolutionary theory.  Dr. Oller has produced

a number of peer-reviewed mathematical arguments showing that linguistic and genetic

complexities cannot be generated by chance.

**CODI Department Hostility to Dr. Oller's Viewpoints**

22.

In spite of his indisputable scholarly acumen and acclaimed classroom

performance, in the last number of years the governing faculty presence in CODI has

methodically discriminated against and marginalized Dr. Oller, progressively removing his

teaching opportunities so as to eliminate entirely his influence on CODI students.

23.

An environment hostile to Dr. Oller singling out his views – on semiotic theory,

milestones of normal speech and language development, linguistics, genetics, evidence of

intelligent design, factors involved in the causation of autism and other neuropathologies, the

origins of the language capacity and of the complexities of genetic endowments that cannot be

explained by chance – has been consistently maintained over the last number of years, and recent

retaliatory actions intended to marginalize this scholar further aggravate that condition.

24.

Faculty members in the CODI department, including defendants, have not hesitated to broadcast their disdain for his views on these subjects.

25.

A herald of the developments of ensuing years, in a November 22, 2005 email message to the CODI faculty, senior faculty member Jack Damico lambasted Dr. Oller for pursuing his own research interests and offered: "Perhaps we should seriously consider removing him [Oller] from the departmental and Ph D [sic] program altogether."

26.

On April 21, 2006, CODI Professor Nicole Müller wrote an email message to the CODI faculty criticizing Dr. Oller's faculty website for including promotional content for and a student's comment on one of his published books.  Though conceding she never read the book discussed, she nonetheless related that her grasp of social responsibility was superior to that of Dr. Oller, as purportedly was her understanding of vaccines, and chided him on these points.

27.

On April 25, 2006, Damico took the occasion to respond to Müller's email message and elaborate for all CODI faculty his assessment of Dr. Oller: "I don't personally value him [Dr. Oller] or his ideas – from creationism to vaccinations to TRN [sic] [TNR (True Narrative Representations)] theory." Damico also added: "BUT the Autism and vaccine issue is of most concern. In fact, over the past 10 or 11 months I have had to deal with this issue no less than five times. That is, people who know that I am the senior faculty member and researcher in CODI have approached me after Oller has given a lecture that has scared/enraged them

8

and complained or questioned me. After what was apparently a very controversial

and troubled talk at the ICS Colloquium earlier this semester, two people – one a

faculty member – called me to complain about him, his ideas and his poor defense

of those ideas. The person thought I should be warned about how much he hurts

our department and its credibi[li]ty."

28.

Damico also related in that message that he had communicated his disdain for Dr.

Oller's views when responding to a student's inquiry about Dr. Oller's scholarship on autism.

Damico wrote to that student: "Apparently he [Dr. Oller] doesn't have much understanding of

this issue.  Personally, I have found he is quite uninformed and biased in his ideas.  Remember,

as someone else told you, he is also someone who believes in Creationism, in the fact that the

world is only several thousands of years old and in the inerrant truth of every word of the

Bible…."

29.

On November 25, 2008, Dr. Oller gave a presentation at the CODI Ph.D.

Colloquium (the CODI department's bimonthly lecture series to Ph.D. students, faculty, and

others in the community) on "Vaccines, Epidemic Neurodevelopmental Disorders, and Autism:

Causes and Recoveries."  He there addressed autism, vaccines, and how neurotoxins, disease

agents, adventitious animal proteins, and their interactions interfere with human biochemistry,

and the consensus of toxicologists on such problematic outcomes.

30.

Professor Damico has given multiple department-sponsored presentations

9

referring to Oller's works and publications as speculative "pseudoscience." Defendant Martin

Ball has repeatedly distributed widely via email his assertions of the same.

31.

As coordinator of the Colloquia for the 2008-09 academic year, Defendant Ball

twice attempted to cancel Dr. Oller's presentation before its occurrence due to his opposition to

Dr. Oller's views and his presentation of toxicology research findings on the causal relationship

of the components found in vaccines and permanent brain injuries including autism.

32.

Dr. Oller has been excluded ever since from participation in that bi-monthly

colloquium by Defendant Ball and Defendant Roussel, consecutively, in their positions as head

of the department.

33.

Dr. Oller's textbook *Autism: The Diagnosis, Treatment, & Etiology of the*

*Undeniable Epidemic* was published by prestigious medical publisher Jones & Bartlett in

September of 2009 with a copyright date of 2010.

**Methodical Elimination of Dr. Oller's Instruction of CODI Students**

34.

Defendants Ball and Roussel, with the authorization of Defendant Barry, since

2006 have effectively eliminated all possibility of student enrollments in the required courses Dr.

Oller teaches for the Ph.D. program of which he was the principal designer and proponent at all

levels through the Louisiana Board of Regents. With the exception of a single seminar in 2008,

these defendants have effectively prevented Dr. Oller from teaching a single graduate course in

10

his own department.

35.

Although the ALSS Ph.D. Proposal as approved by the Board of Regents makes two of Dr. Oller's courses "core requirements" in the ALSS Ph.D. curriculum, over Oller's objections and with the authorization of Defendant Barry, CODI professors including Defendants Ball and Roussel have transgressed the ALSS Ph.D. program document approved by the Regents in order to keep Dr. Oller from teaching Ph.D. students.

36.

During this period of time, Dr. Oller has been exiled from any curriculum planning discussions, against his continuous requests for such allowance to Defendants Ball, Roussel, and Barry.

37.

Defendants Ball and Roussel have also excluded Dr. Oller entirely from the CODI Ph.D. colloquium presentations since 2008, denying his repeated requests for participation.

38.

Since 2005, Defendants Ball and Roussel, in serving as department heads, disallowed Dr. Oller to teach any masters level courses. Since 2009 Defendant Roussel has disallowed Dr. Oller to present to the masters students in the Capstone Seminar, though he had done so annually for the prior nine years.

39.

Defendants Ball and Roussel relegated Dr. Oller exclusively to undergraduate course instruction, including CODI 118 (Introduction to Communication Disorders) and CODI

11

274 (Normal Speech and Development).

40.

Being so assigned, Dr. Oller took the lead in writing textbooks for these two

courses required of undergraduate CODI majors, due to the absence of adequate texts on the

market that comprehended the relevant theoretical and empirical advances occurring rapidly in

the subject areas. He also composed and compiled interactive, digitally searchable,

supplementary materials, and power point summaries linked to the most up-to-date internet

sources, all of which are important to instruction yet not available with other text options.

41.

Dr. Oller was the lead author of *Milestones: Speech and Language Development*

*Across the Lifespan* (Plural Publishing, Inc.) (499 pages, plus a multimedia DVD containing film

clips, power point presentations, multiple choice and essay tests, and a completely searchable

Expanded Table of Contents providing a summary narrative of the whole book abundantly linked

to internet sources, essay questions, references, and a complete index of subjects and authors –

all of which are features missing from the competing texts) for use in CODI 274; and of *Cases:*

*Introducing Communication Disorders Across the Life Span* (Plural Publishing, Inc.) (766 pages,

plus a multimedia DVD containing all of the same supplementary pedagogical innovations just

described for the *Milestones* DVD but advanced and improved), an encyclopedic reclassification

of communication disorders and disease conditions for use in CODI 118.

42.

In the spring of 2010, Defendant Roussel reassigned the instruction of CODI 274

from Dr. Oller to a different professor.  Dr. Oller appealed this removal to Defendant Barry, who

was unresponsive. Dr. Oller then appealed to Dr. Steve Landry, UL Vice President of Academic

Affairs. Dr. Landry's intervention, on information and belief, resulted in Defendant Roussel

returning Dr. Oller to the position of instructor of CODI 274 in the fall of 2010.

43.

Though dutifully reassigning CODI 274 to Dr. Oller in the fall 2010 semester,

Defendant Roussel ensured that it would be the last time that Dr. Oller could teach that long

required class to CODI majors. Not only did Defendant Roussel in spring 2011 remove CODI

274 from the list of courses required for CODI majors, she by new policy forbade CODI majors

to take that class at all – even as an elective.

44.

In its place, Defendant Roussel created a nominally new class – CODI 275 – to be

taught by another professor as the required course for CODI majors. Its substantive distinction

from CODI 274 is not immediately discernable. The evident difference is that CODI 274 is now

reserved for non-CODI majors.

45.

Dr. Oller repeatedly petitioned Defendants Ball and Roussel (each while serving

as head of the department) and Defendant Barry for additional doctoral and graduate teaching

opportunities, as well as for participation in the CODI Curriculum Committee, to no avail.

46.

The CODI Curriculum Committee is composed of CODI faculty and advises the

department head on matters relating to department policy, courses, and other functions.

Decision-making authority on such issues resides in the department head.

13

47.

.        Defendant Roussel maintains no pretense of neutral administrative justification

for her exclusions of Dr. Oller.

48.

On February 16, 2011, Dr. Oller met with Defendant Roussel in her office for his

annual performance evaluation.

49.

Defendant Roussel there stated to Dr. Oller that she would not approve any new

course proposals he presents, whether for classroom or distance learning courses, simply because

the request comes from him. She further explained that she wants to put a stop to his teaching

altogether.

50.

Defendant Roussel stated to Dr. Oller that it was her decision to exclude him from

the CODI Curriculum Committee, and that she had agreed to block him from presenting to the

Ph.D. Colloquium or the masters level Capstone Seminar.

51.

Defendant Roussel explained to Dr. Oller that she made these decisions because,

as she told him, "Your work is controversial and I disagree with you."

52.

She announced her view that his autism research is irrelevant, and she denied

there is an autism epidemic.

14

53.

Defendant Roussel told Dr. Oller that the "only reason" she included him in any

CODI departmental work (referring specifically to assigning Dr. Oller to work with Dr. Arehole

on "Facilities" with reference to the upcoming accreditation review) was because she "had to,"

and she prefers that he be excluded entirely from the CODI department.

54.

Defendant Roussel told Dr. Oller that "you're not wanted here" in the CODI

department at UL, and that he should pursue work elsewhere where he would be "wanted."

55.

Defendant Roussel dismissed as unimportant Dr. Oller's academic publication

record, recognition awards, participation in external scholarly symposia, and favorable student

reviews of his pedagogy.

56.

Instructive of the nature of her outlook, Defendant Roussel bolstered her disposition

toward Dr. Oller by announcing her receipt of approximately 200 email requests demanding his

departure from the faculty.

57.

These email messages were generated from members of the global internet

community in response to a post at the activist website Change.org, which is a clearinghouse for

thousands of petition initiatives on issues such as environmentalism, immigrant rights, gay

rights, health, criminal justice, animal rights, and other social controversies.

58.

Defendant Roussel's reliance on email messages from effectively anonymous internet correspondents of unverifiable intellect or learning in order to evaluate Dr. Oller's scholarly merit and pedagogical service is an unconventional form of academic assessment at UL.

### Censorship of Dr. Oller's Textbooks

59.

In May of 2011 the CODI Curriculum Committee, composed of Defendants Roussel and Ball and Professors Damico, Müller, and Judith Oxley, recommended that the textbooks to be used in CODI 118 and 274 classes be determined solely by the Committee, and this recommendation was accepted and made policy by Defendant Roussel.

60.

On August 11, 2011 – just days before his fall semester classes would begin – Defendant Roussel sent an email message to Dr. Oller informing him that he was no longer authorized to use his own textbooks to teach his classes. She related to him that the Curriculum Committee had selected and she had approved other textbooks and created the standard syllabi for the CODI 118 and 274 courses, and that he was required to cover the listed subjects, conduct the listed activities, and use the prescribed textbooks.  Subsequent to the original Complaint being filed, defendants agreed that Dr. Oller could use his own bok as secondary texts.

61.

The ostensible justification Dr. Roussel and the Curriculum Committee proposed for this intervention in text assignments was to provide "continuity across sections of

16

undergraduate classes taught by various faculty and graduate students." Yet CODI 274 had for

the last several semesters been taught exclusively by Dr. Oller and a graduate student or students.

CODI 118 likewise had in recent semesters been taught only by Dr. Oller and one or two

graduate students.

62.

Neutral "continuity across sections" – an unprecedented concern in the CODI

department, and not required by university policy or department accreditation standards – could

be as well served by requiring Dr. Oller's textbooks and related materials to be used by the

students teaching the smaller sections.  But Defendant Roussel instead forbade this senior

professor to use his own published works in courses he teaches.

63.

The replacement texts the Curriculum Committee selected and Defendant Roussel

required for the CODI 118 and 274 courses are inferior in content, scholarship currency, and

supplementary material to Dr. Oller's textbooks.

64.

No other CODI faculty member has been subject to like censorship of his or her

published texts by the head of the CODI department.

65.

The textbook that Defendant Roussel requires for Dr. Oller's CODI 274 course

(now forbidden to CODI majors) and for the course she newly created to replace it (CODI 275)

is one and the same.

17

66.

On September 30, 2011, after several weeks of use of the required textbooks, Dr.

Oller emailed his request to CODI Curriculum Committee Chair Professor Müller seeking

committee reconsideration of the recommendation to Dr. Roussel of the textbooks for CODI 118

and 274. He asked that the Committee propose that he use the texts he authored for these classes

in the upcoming fall 2012 semester.

67.

The CODI department class assignment schedule revealed he was slated to teach

both CODI 118 and 274 in the spring 2012 semester.

68.

In his message to Professor Müller, Dr. Oller observed that the required texts

were inferior to his own in that they are not as up to date in research, as broad in coverage of

subject matter, coherent in organization, or possessing the quality of his dynamic and interactive

digitally searchable supplemental materials. He further noted that he was preparing a list of the

numerous errors in these texts both in analysis and definitions, as well as in contradictions

among co-contributors. Dr. Oller also offered that if permitted to use his own texts, he would

insert any area of non-overlap between the currently required texts and his own and supplement

his instruction with such material.

69.

Dr. Oller did not receive a response from the Committee on his request.

**Dr. Roussel's Final Steps in Eliminating Dr. Oller's Contact with CODI Students**

70.

Dr. Oller's sections of classes are significantly more popular with CODI students than those taught by graduate assistants.

71.

However, in the fall of 2011, Defendant Roussel moved Dr. Oller's CODI 118 class – the one remaining course he is allowed to teach to CODI students – from a room holding 45 people (a capacity limit that already excluded students who desired to take his class) to a room that only accommodated 30 students.

72.

Concurrently, Defendant Roussel assigned the larger classroom that held 45 students to the graduate student who taught the other section of CODI 118.

73.

Then on October 14, 2011, Defendant Roussel in an email message to Dr. Oller informed him that she adjusted his teaching assignments for the spring 2012 semester, and that he would no longer be teaching CODI 118.

74.

The adjusted teaching responsibilities Defendant Roussel assigned Dr. Oller for the spring 2012 semester include teaching the CODI 274 class to non-CODI students, and teaching two sections of UNIV 100 – a study skills course offered to all UL freshmen (which Dr. Oller had only volunteered to instruct on an "overload" basis in addition to his CODI instruction).

19

75.

Defendant Roussel with that stroke thereby completed the removal of all of Dr.

Oller's pedagogical interaction with CODI students.

76.

All other faculty members in the CODI department may and do teach CODI

department undergraduate, graduate, or Ph.D. students.

77.

Dr. Oller, the designer of the CODI Ph.D. program and formerly instructor in the

doctoral and masters programs, is now forbidden to teach any CODI students at all, or even use

his own textbook when teaching non-department students.

**The University's Contracted Faculty Assignments and Promise of Academic Freedom**

78.

Dr. Oller has been classified as a Track 4 professor by UL.  In reprisal for filing this suit

and for otherwise attempting to enforce his rights, Defendants caused him to be re-classified as a

Track 3 professor.  Defendants were responsible through manipulation of his class alignments to

ensure he was reduced t Track 3.

79.

The UL Faculty Handbook at Appendix A, Document XXI sets forth the defining  features of

each of the faculty workload tracks, from Track 1 through Track 4.

80.

Track 1 faculty members carry a "teaching load predominantly [of] undergraduate

courses." Track 2 faculty members carry a "teaching load predominantly [of] undergraduate

courses, often intermixed with occasional graduate level courses; faculty in this track expected to

hold Graduate Faculty status." Track 3 faculty members carry a "teaching load consistently

[that] includes some courses at the graduate level, with at least one course per year at the 500+

level or a minimum enrollment of five graduate students in the course if it is at the 400(G) level;

faculty in this track [are] expected to hold Graduate Faculty status."

81.

Track 4 faculty members carry a "teaching load [of] virtually all graduate courses;

faculty in this track [are] expected to hold Graduate Faculty status and be actively involved in

teaching and directing doctoral students."

82.

Document II of Appendix A to the UL Faculty Handbook contains the Board of

Regents' Statement on Academic Freedom, Tenure and Responsibility (UL Academic Freedom

policy).

83.

The Introduction to the UL Academic Freedom policy states: "This statement

establishes and defines a uniform, statewide policy on academic freedom, tenure, and

responsibility for the state's public colleges and universities, including their professional

schools."

84.

The Academic Freedom section of the policy states:

Academic freedom is the right of members of the academic community freely to
study, discuss, investigate, teach, conduct research, and publish as appropriate to
their respective roles and responsibilities. Because the common good depends

21

upon the free search for and exposition of truth and understanding, full freedom in research and publication is essential, as is the freedom to discuss scholarly subjects in the classroom.

85.

The UL Faculty Handbook states in Appendix A Document XI under the heading "Academic Freedom" that the "policy against harassment shall be applied in a manner that protects academic freedom and freedom of expression, including but not limited to the expression of ideas, however controversial, in the classroom setting, academic environment, university-recognized activities, or on the campus."

86.

UL's Faculty Handbook also states that "The University of Louisiana at Lafayette subscribes to the joint '1940 Statement of Principles of Academic Freedom' of the Association of American Colleges and the American Association of University Professors."

87.

That 1940 Statement sets forth faculty members' entitlement to freedom in research, publication, and classroom discussion of the course subject matter. It also affirms that a teacher's public statements as a citizen should be free of institutional censorship or discipline.

88.

The Board of Supervisors under which UL is governed has issued "Board Bylaws and Rules," a document including a standard guaranteeing academic freedom to faculty members. In Chapter III of that document, the Board sets forth the following:

22

The University of Louisiana System is committed to the principle of academic freedom. This principle acknowledges the right of a teacher to explore fully within the field of his/her subject as he/she believes to represent the truth. The principle also includes the right of a member of the academic staff of the System to exercise in speaking, writing, and action outside the System the ordinary rights of the American citizen, but it does not decrease the responsibility and accountability that the member of the academic staff bears to the system, the state, and the nation.

89.

UL promises its faculty the freedoms outlined in its various Academic Freedom guarantees without restraint or censorship by UL officials.

90.

Dr. Oller accepted and continued employment with UL in reasonable reliance on the faculty workload tracks standards and Academic Freedom guarantees in the UL Faculty Handbook and Board Bylaws and Rules.  In doing so he changed his position leaving a tenured professorship at the University of New Mexico.  Defendants were obligated under the scope of La. Civil Code art. 1967 to enforce the standards and guarantees relied upon by Dr. Oller.

91.

According to UL's Faculty Handbook, "[t]enured faculty shall retain their status until they retire, resign, or are terminated for cause or as a result of financial exigency."

92.

In 1996, UL President Ray Authement on behalf of UL offered Dr. Oller employment as a tenured faculty member in the UL CODI department, and Dr. Oller accepted this offer, again in reliance upon the standards delineated in ¶90.

23

93.

Dr. Oller and UL had and have the legal capacity to enter into that contract, and to renew such contract at all relevant times since its origin.

94.

The object and lawful purpose of the contractual relationship between Dr. Oller and UL is the provision of Dr. Oller's teaching, administration, and scholarship in return for a salary, benefits, teaching opportunities commensurate with his classification, and academic freedom.

95.

Dr. Oller, as a tenured faculty member, is not employed at-will by UL. The terms of Dr. Oller's employment were and are governed by UL's Faculty Handbook, and the Board of Supervisors Bylaws and Rules, including the terms set forth above.

96.

At all material times, Defendant Ball was, and Defendants Roussel and Barry were and are, agents of UL in exercising their authority over Dr. Oller and obligated to exercise that authority in conformity with the terms of the UL Academic Freedom guarantees and faculty workload tracks policy.

97.

The UL Faculty Handbook recites that each department head bears the authority and responsibility to "make[] work and project assignments," "coordinate[] the scheduling of departmental course offerings," and "implement[] University, College, and department policies." (UL Faculty Handbook, Appendix A, Document XXXVI.)

98.

Defendants Ball, Roussel, and Barry knew or should have known that Dr. Oller would rely on the terms of the UL Faculty Handbook and Supervisory Board Rules as defining his employment relationship with UL.  Accordingly they had an obligation to act in consonance with those contractual rules.

99.

Defendants Ball, Roussel, and Barry knew or should have known that their refusal to honor UL promises to Dr. Oller and the contract terms governing his tenured employment would cause, inter alia, nonpecuniary loss to Dr. Oller.

100.

Defendants Ball, Roussel, and Barry have denied Dr. Oller the teaching and related assignments corresponding to his Track 4 status as required by the UL Faculty Handbook and have removed him from track 4 status.

101.

Defendant Barry, in his capacity as Dean of the College of Liberal Arts, has, over Dr. Oller's repeated petitions and objections, authorized Defendant Ball's and Defendant Roussel's violations of the workload faculty track standards, thereby participating in them.

102.

Dr. Oller's presentation of his scholarly viewpoints during lectures and instruction in his role as professor at UL, which viewpoints Defendants oppose and motivated their censorship of Dr. Oller, are directed to matters of academic and public concern directly related to the subjects he teaches, are based on sound empirical and theoretical foundations, and thus in

the contexts of their university presentation are properly communicated.

103.

Dr. Oller's published textbooks and course syllabi pertaining to them, in all their details and their particular elements and supplementary components, are entirely relevant to the subject matter the university has contracted him to teach and that is spelled out in the course catalogues for students and faculty.

104.

Defendants Ball, Roussel, and Barry's participation in denying Dr. Oller instruction opportunities, and Defendants Roussel and Barry's denying to Dr. Oller his use of his own scholarship in teaching courses, because of his viewpoints on matters of academic and public concern, constitutes a violation of the UL Academic Freedom agreement with tenured faculty members as set forth above.  Defendant Roussel's role in stripping Dr. Oller of his endowed professorship further caused nonpecuniary harm to Dr. Oller and his reputation.

105.

Defendant Roussel has denied Dr. Oller academic freedom in the classroom by forbidding him to use his own textbooks in his assigned courses because of his viewpoints on matters of academic and public concern.

106.

Defendants Ball, Roussel, and Barry denied Dr. Oller academic freedom by systematically excluding Dr. Oller from opportunities to lecture or teach CODI students because of his viewpoints on matters of academic and public concern.

26

107.

Defendant Barry, in his capacity as Dean of the College of Liberal Arts, has been consulted by Defendant Roussel and authorized her violations of the Academic Freedom agreement, thereby participating in them. In that capacity Defendant Barry was apprised of and authorized Defendant Ball's violations of the Academic Freedom agreement.

### HARM TO PLAINTIFF

108.

Defendants' actions have censored Dr. Oller's speech, precluded him from merit pay increases, damaged his reputation, aggrieved him, and irreparably interfered with and injured his constitutional right to freedom of speech.

### ALLEGATIONS OF LAW

109.

All of the acts of Defendants were executed and are continuing to be executed by them under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the State of Louisiana.

110.

Plaintiff is suffering irreparable harm from the conduct of Defendants and has no adequate or speedy remedy at law to correct or redress the deprivation of his rights by Defendants. Unless the conduct of Defendants is enjoined, Plaintiff will continue to suffer irreparable injury.

### FIRST CAUSE OF ACTION

### Violation of Plaintiff's First Amendment Right to Free Speech

111.

Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs

1-110 of this Complaint.

112.

Dr. Oller's teaching, scholarship, and other speech in and out of the classroom on

semiotic theory, milestones of normal speech and language development, linguistics, genetics,

evidence of intelligent design, factors involved in the causation of autism and other

neuropathologies, the origins of the language capacity and of the complexities of genetic

endowments that cannot be explained by chance, constitute speech of public concern.

113.

By engaging in and authorizing the censoring conduct set forth above (e.g.,

banning Dr. Oller's textbooks; denying Dr. Oller opportunities to lecture or instruct CODI

students at any level or form; forbidding his participation in CODI department policy

committees; punitively diminishing his class size; urging him to leave the CODI department;

announcing to him that the elimination of his lecturing, teaching, and CODI department

participation opportunities is due to his viewpoints on matters of academic and public concern –

thereby condemning him for his outlooks as an official act of department authority) Defendants

Roussel and Barry were motivated by their hostility or opposition to Dr. Oller's viewpoints and

have discriminated against and are discriminating against him based on his viewpoints.

114.

Defendant's policies and practice violate Plaintiff's right to freedom of speech as

guaranteed by the First Amendment to the United States Constitution as incorporated and

applied to state action through the Fourteenth Amendment.

## SECOND CAUSE OF ACTION

### Violation of Plaintiff's First Amendment Right to Protection from Retaliation

115.

Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1-110 of this Complaint.

116.

Dr. Oller is suffering an adverse employment action in that Defendants Roussel and Barry have removed from him all opportunities to lecture or teach CODI students and are censoring his textbooks from the curriculum, stripped him of his endowed professorship based on their disagreement with or opposition to his views on matters of academic relevance and public concern, as set forth herein.

117.

Dr. Oller's speech consisting of his teaching and scholarship, in and out of the classroom on semiotic theory, milestones of normal speech and language development, linguistics, genetics, evidence of intelligent design, factors involved in the causation of autism and other neuropathologies, the origins of the language capacity and of the complexities of genetic endowments that cannot be explained by chance, as well as related issues constitute speech of public concern that are protected by the First Amendment.

118.

Tenured faculty members at a public university have a significant interest in commenting on matters of public concern related to their scholarly expertise.

119.

Far from disrupting university efficiency, university officials' honoring of faculty

freedom of speech and academic freedom promotes the interests of the university as the

"marketplace of ideas," which the governing bodies of UL by policy make a defining

commitment and objective of the university.

120.

Dr. Oller's interest in scholarly comment on semiotic theory, milestones of

normal speech and language development, linguistics, genetics, evidence of intelligent design,

factors involved in the causation of autism and other neuropathologies, the origins of the

language capacity and of the complexities of genetic endowments that cannot be explained by

chance through teaching, scholarship, and public commentating within and outside the

university, both significantly outweighs and does not interfere with any interest that UL officials

possess for workplace efficiency.

121.

Dr. Oller's communication of viewpoints on matters of public concern motivated

Defendants Roussel and Barry to undertake the adverse employment actions against him set

forth herein.

122.

Defendant Roussel's and Defendant Barry's conduct toward Dr. Oller as set forth

herein violates his First Amendment right to freedom from retaliation.

### THIRD CAUSE OF ACTION

### Breach of Contract and Detrimental Reliance

123.

Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1-110 of this Complaint.

124.

UL policy promises to faculty members academic freedom in all their pursuits and responsibilities, and promises to assign academic responsibilities conforming to their workload track designation.

125.

As UL officials individually and jointly in possession of authority over Dr. Oller, Defendant Ball was, and Defendants Roussel and Barry were and are, bound to uphold UL's promise to provide him academic freedom in all his university pursuits and responsibilities, and to assign him academic responsibilities conforming to his Track 4 workload track designation.

126.

Further, Dr. Oller relied to his detriment on the promises contained in UL's various policy guarantees on academic freedom and workload assignments, as set forth herein, materially changing his position and relying upon the representations to his detriment within the scope fo the Louisiana Civil Code art 1967.

127.

Defendants failed to perform their obligation to provide Dr. Oller with academic freedom. Instead, Defendants Ball, Roussel, and Barry systematically denied and removed opportunities for Dr. Oller to lecture or teach CODI students because they disagree with or wish to suppress Dr. Oller's viewpoints on matters of public concern he expressed in and out of the

classroom and in the affected texts. Defendant Roussel censored Dr. Oller's textbooks for the same reason.

128.

As a result of the Defendants' denial of academic freedom to Dr. Oller, he has been penalized for his speech, denied opportunities to instruct students, and denied opportunities to share the content of his own scholarship.

129.

Defendants Ball, Roussel, and Barry failed to perform their obligation to provide Dr. Oller academic assignments in conformity with his Track 4 faculty classification.

130.

As a result of Defendants' failure to so assign Track 4 responsibilities to Dr. Oller, he has been penalized for his speech, denied opportunities to instruct students, and denied opportunities to share the content of his own scholarship.  Additionally he has been stripped of his Track 4 status and his Endowed Professorship.

131.

Defendants intended, through their failure to perform their several contractual obligations recited herein, to aggrieve the feelings of Dr. Oller, and Dr. Oller has been so aggrieved due to Defendants' nonperformance.

132.

Defendants in their official capacities have violated Louisiana law by breaching their contractual and promissory obligations to Dr. Oller and denying him academic freedom and academic assignments as set forth in UL policy.

## FOURTH CAUSE OF ACTION

## DEFAMATION

133.

Plaintiff re-alleges and incorporates herein, as though fully set forth, paragraphs 1-110 of this Complaint.

134.

Defendants in their individual capacity used defamatory words to describe Dr. Oller, his book, his works and his abilities as a professor.

135.

The defamatory words were published by the defendants to students, employees and faculty members.

136.

The defamatory words used by defendants in reference t Dr. Oller were false.

137.

The defamatory words were made with actual malice in that defendants knew that the words were false or in the alternative were made with a reckless disregard for the truth.

138.

As a result of this defamation, Dr. Oller suffered damages to be shown in trial including, worry humiliation and embarrassment.

139.

Plaintiff demands trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.      That this Court issue a preliminary and permanent injunction, restraining Defendants, their agents, servants, employees, officials, or any other person acting in concert with them or on their behalf, both now and in the future, from discriminating against Dr. Oller for his viewpoints on matters of public concern by denying him all opportunities to lecture and teach doctoral, masters, and undergraduate CODI students, and censoring his textbooks relevant to the classes he teaches; and enjoining Defendants' specific performance of their contractual and promissory obligations to Dr. Oller;

B.      That this Court issue a declaratory judgment stating that Defendants' discrimination, retaliation, and restrictions imposed on Plaintiff as set forth herein violated his right to freedom of speech as guaranteed under the First Amendment to the United States Constitution and his rights under Louisiana law;

C.      That this Court award against Defendants in their individual capacities nominal damages, and compensatory damages in an amount to be determined by the evidence, for the violation of Plaintiff's constitutional and state law rights and actual damages for defamation;

D.      That the Court award Plaintiff's costs and expenses of this action, including a reasonable attorneys' fees award, in accordance with 42 U.S.C. § 1988;

E.      That this Court issue the requested injunctive relief without a condition of bond or other security being required of Plaintiff;

F.      That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders;

G.      That the Court grant all other relief it deems just and proper.

Respectfully submitted ,

/s/John B. Wells
John B. Wells
LA Bar No. 23970
LAW OFFICES OF JOHN B. WELLS
Mailing address:
P.O. Box 5235
Slidell, Louisiana 70469-5235
Physical address:
769 Robert Blvd., Suite 201D
Slidell, Louisiana 70458
Telephone: (985) 641-1855
Facsimile: (985) 649-1536
johnlawesq@msn.com

## CERTIFICATE OF SERVICE

I certify a copy of the foregoing pleading has been served upon counsel for the defendant by the

court's EC/CMF system this 25th  day of October 2013.

//s// John B. Wells
John B. Wells